RECORD NUMBER: 14-1277

# United States Court of Appeals

### *for the*

# Fourth Circuit

**BRANDON RAUB,**

*Appellant,*

– v. –

**MICHAEL CAMPBELL,**

*Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND**

# BRIEF OF APPELLEE

**JEFFREY L. MINCKS**
**STYLIAN P. PARTHEMOS**
**JULIE A. C. SEYFARTH**
**CHESTERFIELD COUNTY**
**ATTORNEY'S OFFICE**
**9901 Lori Road, Room 503**
**P.O. Box 40**
**Chesterfield, VA 23832**
**(804) 748-1491**
**mincksj@chesterfield.gov**
**parthemoss@chesterfield.gov**
**seyfarthj@chesterfield.gov**

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _14-1277_    Caption: _Brandon Raub v. Michael Campbell_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Michael Campbell_
(name of party/amicus)

_____

who is _____Defendant/Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                 ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                         ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Jeffrey L. Mincks                          Date:  April 8, 2014

Counsel for:  Michael Campbell

# CERTIFICATE OF SERVICE
**************************

I certify that on ____April 8, 2014____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Anthony F. Troy Esquire
Charles A. Zdebski, Esquire
Eckert Seamans Cherin & Mellott LLC
Eighth and Main Building, Suite 1450
707 East Main Street
Richmond, VA  23219

William H. Hurd, Esquire
Stephen  C. Piepgrass, Esquire
Troutman Sanders LLP
Troutman Sanders Building
1001 Haxall Point
Richmond, VA  23219

/s/ Jeffrey L. Mincks                                April 8, 2014
      (signature)                                         (date)

# SUBJECT INDEX

**Page**

Corporate Disclosure Statement

Subject Index..............................................................................................i

Table of Authorities ................................................................................ iii

Introduction ...............................................................................................1

Statement of Facts and Material Proceedings..........................................4

The Facts of this Case ..............................................................................4

Statement of Material Proceedings ........................................................20

Summary of the Argument......................................................................27

Argument.................................................................................................31

Standard of Review.................................................................................31

   1. Campbell Is Entitled To Summary Judgment Based On Qualified
      Immunity To Raub's Fourth Amendment Claim Because Campbell
      Did Not Violate Any Of Raub's Clearly Established Constitutional
      Rights Of Which He Could Reasonably Have Known. ...........................33

      A. Campbell cannot be held liable for Raub's Fourth Amendment
         claim because Campbell never seized Raub. ......................................33

      B. There is no case law in this Circuit which would provide
         guidance to a mental health official, acting pursuant to <u>Va.
         Code</u> §§ 37.2-808 and 809, on the standard for determining
         probable cause for detaining an individual for mental health
         evaluation or treatment ......................................................................35

      C. Campbell's conduct and decisions meet the standard established
         by this Court for law enforcement officers who detain
         individuals for mental health evaluations. .........................................36

D. The subsequent clinical opinions reached by a retained, testifying expert do not change the qualified immunity analysis and material facts by which Campbell is judged. ...............................42

2. Campbell Is Entitled To Qualified Immunity On Raub's First Amendment Claim..................................................................................44

3. Raub Is Not Entitled To An Injunction Against Campbell Because Campbell Has Not Violated Any Of Raub's Constitutional Rights, And There Is No Evidence To Support The Contention That He Will Violate Any Of Raub's Constitutional Rights In The Future. .........48

Conclusion .......................................................................................................49

Certificate of Service ......................................................................................51

# <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Anderson v. Creighton</u>,
    457 U.S. 635 (1987).................................................................................27, 32

<u>Anderson v. Liberty Lobby, Inc.</u>,
    477 U.S. 242 (1986)............................................................................................4

<u>Celotex Corp. v. Catrett</u>,
    477 U.S. 317 (1986)............................................................................................4

<u>Cloaninger v. McDevitt</u>,
    555 F.3d 324 (4th Cir. 2011) ..........................................................................31

<u>Davis v. Bacigalupi</u>,
    711 F. Supp. 2d. 609 (E.D. Va. 2010) ...............................................28, 35, 43

<u>Direx Israel, Ltd. v. Breakthrough Medical Corp.</u>,
    952 F.2d 802 (4th Cir. 1991) ..........................................................................33

<u>Gooden v. Howard County, Maryland</u>,
    945 F.2d 960 (4th Cir. 1991) ...................................................................passim

<u>Harlow v. Fitzgerald</u>,
    457 U.S. 800 (1982)...................................................................................32, 39

<u>Jones v. Buchanan</u>,
    325 F.3d 520 (4th Cir. 2003) ..........................................................................33

<u>Los Angeles v. Lyons</u>,
    461 U.S. 95 (1983).....................................................................................31, 48

<u>Mitchell v. Forsyth</u>,
    472 U.S. 511 (1985)..........................................................................................31

<u>Monsanto Co. v. Geertson Seed Farms</u>,
    561 U.S. 139 (2010)..........................................................................................48

Pearson v. Callahan,
    555 U.S. 223 (2009)......................................................................32

Reichle v. Howards,
    132 S. Ct. 2088 (2012)....................................................30, 45, 46

Ross v. Early,
    746 F.3d 546 (4th Cir. 2014) ...............................................31, 32

S.P. v. The City of Takoma Park, Md.,
    134 F.3d 260 (4th Cir. 1998) ...............................................passim

Simmons v. Poe,
    47 F.3d 1370 (4th Cir. 1995) .......................................................48

Thompson v. Potomac Elec. Power Co.,
    312 F.3d 645 (4th Cir. 2002) .......................................................47

Tobey v. Jones,
    706 F.3d 379 (4th Cir. 2013) .....................................30, 45, 46, 48

**Rules, Statutes, and Other Authorities**

42 U.S.C. § 1983............................................................................3, 32, 45

Fed. R. Civ. P. 12(b)(6)......................................................................21, 22

Fed. R. Civ. P. 56(c)................................................................................31

U.S. Constitution, First Amendment ..............................................passim

U.S. Constitution, Fourth Amendment ...........................................passim

U.S. Constitution, Fifth Amendment ...................................................33

U.S. Constitution, Fourteenth Amendment ..........................................33

Va. Code § 37.2-100 ...........................................................................7, 20

iv

Va. Code § 37.2-501 ...................................................................................7

Va. Code § 37.2-808 ...................................................................6, 16, 29, 40

Va. Code § 37.2-808(2) .............................................................................7

Va. Code § 37.2-808(A) .........................................................................6, 7

Va. Code § 37.2-808(B) ..............................................................1, 7, 8, 12, 13

Va. Code § 37.2-808(G) ....................................................................passim

Va. Code § 37.2-809 .......................................................................passim

Va. Code § 37.2-809(B) ...............................................................8, 9, 35

Va. Code § 37.2-809(H) .............................................................................8

Va. Code § 37.2-814 ...................................................................................8

Va. Code § 37.2-815 ......................................................................2, 8, 19

Va. Code § 37.2-817 ...................................................................................8

Diagnostic and Statistical Manual of Mental Disorders, vol. 5 ..............................14

# Introduction

On August 16, 2012, the FBI and Chesterfield County, Virginia law enforcement officials detained the Plaintiff/Appellant, Brandon Raub, on an Emergency Custody Order under Va. Code § 37.2-808(G) so that Raub could be evaluated by a County mental health crisis intervention clinician.  The law enforcement officials detained Raub after Raub posted homicidal threats on the internet which were so disturbing that two friends of Raub's who had served with Raub in the Marines reported them to the FBI.  Raub's Marine friends told the FBI that Raub was not acting like himself and expressed concern that Raub was serious about his threats and capable of committing the violent acts he was threatening. Before detaining Raub, FBI agents interviewed him for 20-25 minutes at his residence. During the interview, Raub refused to renounce his threats and exhibited psychotic behavior.  The agents concluded, "We need to get this guy evaluated."

Defendant/Appellee Michael Campbell (a crisis intervention clinician) interviewed and evaluated Raub pursuant to Va. Code § 37.2-808(B).  Campbell concluded that Raub suffered from a mental illness that made him a substantial danger, and he petitioned a Chesterfield County magistrate for issuance of a Temporary Detention Order pursuant to Va. Code § 37.2-809 so that Raub could be evaluated at a mental health facility.  In support of the Petition, Campbell submitted to the magistrate a Prescreening Report which contained his findings,

and a copy of an email from one of Raub's Marine friends to the FBI, which listed verbatim Raub's threats of violence. The magistrate found probable cause and issued a Temporary Detention Order. Raub was then transported to John Randolph Medical Center in Hopewell, Virginia for evaluation.

Mental health professionals at John Randolph concluded that Raub needed additional treatment, so they petitioned the General District Court of Hopewell for Raub to be hospitalized for a period not to exceed 30 days, pursuant to Va. Code § 37.2-815. After a full evidentiary hearing, at which Raub and his attorneys were present, a Special Justice of the Hopewell General District Court concluded by clear and convincing evidence that Raub needed to be detained for additional treatment. J.A. 23. Raub was then transported to a VA facility in Salem, Virginia.

Over a month later, attorneys for the Rutherford Institute (who represent Raub in this case) complained to the Virginia State Inspector General that the law enforcement and mental health officials had acted improperly in evaluating and detaining Raub. The Inspector General investigated the Rutherford complaint and concluded that "those responsible for [Raub's] evaluation could have been guilty of 'neglect'" under state law had they failed to take Raub into custody to receive mental health services. J.A. 379-85.

Raub filed a Complaint, suing two named and 10 John Doe federal and local law enforcement officials as well as three mental health workers (including

Campbell) under 42 U.S.C. § 1983. Raub contended that these defendants violated Raub's First and Fourth Amendment rights by detaining him. Raub's Complaint alleged wide-spread collusion between federal and local law enforcement officials to silence anti-government speech by veterans, supposedly pursuant to a program named "Operation Vigilant Eagle". J.A. 24-26. He later dismissed all of the law enforcement officials and two of the mental health workers from the lawsuit with prejudice and amended his Complaint to eliminate all references to "Operation Vigilant Eagle." J.A. 292-304.     Campbell was left as the sole remaining Defendant.

Campbell moved for summary judgment on qualified immunity grounds because his actions did not violate Raub's constitutionally protected rights and, based on the law and the undisputed facts, Campbell could not have concluded that his actions were unconstitutional. The district court ruled in Campbell's favor, finding that his actions were objectively reasonable and that there was no case in the Fourth Circuit that established the legal standard for a mental health professional performing the duties Campbell performed. This case remains a case of first impression in this Circuit. (Doc. 12-1 at 2.)

## Statement of Facts and Material Proceedings

In support of his Motion for Summary Judgment, Campbell submitted a sworn statement and the sworn statements of two Chesterfield County law enforcement officers who detained Raub; Campbell's own deposition testimony and the deposition testimony of the FBI Agent who ordered Raub to be detained; and a number of authenticated documents. J.A. 386-706. Raub did not submit any factual evidence of his own or challenge any of the facts established by Campbell.[1] J.A. 961.

## The Facts of this Case

On August 12, 2012, four days before Raub was detained, FBI Agent Jason Fullerton received a telephone call from Sean Lawlor, an ex-Marine who had served with Raub. J.A. 532, 989. Lawlor was concerned that Raub was posting increasingly threatening and action-oriented posts on Facebook. Id. On August 15, 2012 Howard Bullen, a Marine veteran who worked closely with Raub during

---

[1] Raub submitted only a report from a retained expert psychologist, Dr. Catherine Martin. Dr. Martin interviewed Raub for the first time on October 11, 2013, the same day Dr. Martin wrote her report and 14 months after Raub posted his threats on Facebook. Dr. Martin did not challenge any of the facts established by Campbell and she did not dispute that Raub said and wrote the words and statements attributed to him. Rather, she disagreed with Campbell regarding what Raub's behavior meant in a clinical sense. The uncontradicted and uncontested testimony of Campbell and the law enforcement officials, and the authenticated documents in the record, comprise all of the facts of this case necessary to determine qualified immunity. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

4

their deployment in Iraq and who kept in touch with Raub after returning from duty, also called Agent Fullerton to express his concerns about Raub's behavior. Id.  Bullen followed up the telephone call with an email to Agent Fullerton later the same evening.  Id.  In the email, Bullen expressed his concern about Raub's threatening posts, which he believed were possibly "more than just extremist rhetoric." Id.

Bullen's email quoted verbatim the threats Raub had recently posted on Facebook. J.A. 989-90.  Raub claimed that "the Revolution" was coming and would "be at my door soon to pick me up to lead it. (August 14, 2012)." Id.  He stated, "I'm gunning whoever run the town. (August 13, 2012)"; "Richmond is not yours.  I'm about to shake some shit up.  This is the start of you dying.  (August 14, 2012)"; and "This is revenge.  Know that before you die.  (August 15, 2012)". [2] J.A. 989-90.  In his email, Bullen warned Agent Fullerton that "knowing [Raub's] personality I feel he genuinely believes in this and is not simply looking for attention." J.A. 990.

The following morning – August 16 – Agent Fullerton sent Bullen's email to FBI Agent Terry Granger.  Granger then forwarded it to FBI Agent John Wyman,

---

[2] Raub now claims that some of his posts are also song lyrics and, therefore, should not have been construed as threats of violence.  However, when asked by the FBI and by Campbell whether he was serious about the threats, Raub did not say that the quotes were "only song lyrics."  Instead, he told the FBI, "We will all see very soon what this all means", and he told Campbell that he felt justified in following through with his threats.  J.A. 505, 508, 576.

noting "This guy sent some specific posts – it is worrisome I think."  J.A. 532.

Agent Granger also sent Bullen's email to Agent Michael Paris, a Chesterfield

County Police Detective who is deputized as a federal agent and is assigned to the

FBI as a member of the FBI's Joint Terrorism Task Force. J.A. 392, 398-99, 414-

15, 502, 503, 507, 531-33. Agent Wyman decided that law enforcement officers

should talk with Raub in person and determine whether he was a threat to carry out

the acts of violence he was threatening and whether Chesterfield County's Mental

Health Crisis Intervention personnel needed to evaluate him. J.A. 416-17, 433,

504, 507.

The process for detaining an individual in order to conduct a mental health

evaluation is set forth in Va. Code §§ 37.2-808 and 37.2-809.  Va. Code § 37.2-

808(A) provides for individuals to be detained for a period of up to four hours

pursuant to an Emergency Custody Order ("ECO").[3]  Such a detention requires

probable cause to believe that the individual "has a mental illness" and that, as a

result of the mental illness, there exists a "substantial likelihood" that the person

"will, in the near future" cause "serious physical harm to himself or others as

evidenced by recent behavior causing, attempting, or threatening harm and other

relevant information, if any." Va. Code § 37.2-808(A).  The detention can only be

effected in one of two ways:  (1) a magistrate may issue a written ECO "upon the

---

[3]  The four hour detention period could be extended for one additional period of
two hours.  Va. Code § 37.2-808 (2012).

6

sworn petition of any responsible person, treating physician, or upon his own motion" Va. Code § 37.2-808(A); or (2) a law enforcement officer may detain the individual without a written ECO "based upon his observation or the reliable reports of others." Va. Code § 37.2-808(G). Thus, the ECO detention in Virginia can occur only at the behest of a magistrate or a law enforcement officer.[4]

Once an individual is detained pursuant to an ECO, he is transported to a "convenient" or "appropriate" location where he is evaluated to determine whether he needs to be hospitalized for additional evaluation or treatment. Va. Code § 37.2-808(B), (G). The evaluation must be conducted by "a person designated by the community services board who is skilled in the diagnosis and treatment of mental illness and who has completed a certification program approved by the [Virginia] Department [of Behavioral Health and Developmental Services]".[5] Va. Code § 37.2-808(B). Campbell met all of the qualifications required by Va. Code § 37.2-

---

[4] Although Virginia law allows only a magistrate or a law enforcement officer to make the decision to detain an individual pursuant to an ECO, Raub calls it a "stunning omission" that Campbell, a mental health worker with no statutory role in the ECO process, did not speak to Raub before Raub was detained by police. Raub's comment reveals a fundamental misunderstanding of Virginia's mental health detention process, a misunderstanding shared by Raub's retained expert psychologist, Dr. Martin, who also criticizes Campbell for not involving himself in the ECO process. (Br. of Appellant at 11, 17.)

[5] The community services board is a public body which provides mental health services within a city or county. Va. Code §§ 37.2-100, 37.2-501.

808.[6] J.A. 572.

After the designee of the community services board has conducted the evaluation required by Va. Code § 37.2-808(B), a magistrate may issue a Temporary Detention Order ("TDO"), which provides for an individual to be transported to a mental health facility for a period of up to 72 hours for further evaluation and treatment. Va. Code § 37.2-809(B), (H). The magistrate may issue the TDO "upon the sworn petition of any responsible person, treating physician, or upon his own motion", if it appears that probable cause exists to believe that the person "has a mental illness" and, as a result of that mental illness, there exists a "substantial likelihood" that the person "will, in the near future" cause "serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any."[7] Va. Code § 37.2-809(B). This standard is identical to the standard for issuing an ECO. However, while an ECO is issued prior to the evaluation by the designee of the

_____

[6] Raub's expert, Dr. Martin, did not meet the qualifications required by Va. Code § 37.2-808(B). J.A. 830.

[7] Prior to the conclusion of the 72 hour period, individuals at the facility where the person has been detained may seek an order providing for the person to be detained for up to an additional 30 days of treatment and evaluation. Va. Code § 37.2-815, 817. Before this additional detention period can be ordered, a judge or special justice of the local General District Court must conduct an evidentiary hearing at which the person may be represented by a lawyer and present evidence contesting his further detention. Va. Code §§ 37.2-814, 815.

community services board, a TDO may not be issued until after that evaluation takes place. A TDO, unlike an ECO, requires a written warrant issued by a magistrate upon a judicial finding of probable cause. Id.

The initial FBI plan was to contact Raub on August 17 to determine if he needed a mental health evaluation. However, after receiving additional information from Bullen and Lawlor on August 16, Agent Wyman decided the contact could not wait until the next day. As Wyman told Paris, "We got to go tonight. The postings are a little more volatile. They're getting a little bit more violent oriented and we can't wait until Friday. We've got to go tonight." J.A. 440, 504, 507-08.

Law enforcement officials met at a "staging area" behind an elementary school near Raub's home at 6:10 on the evening of August 16 to receive a briefing about Raub and to discuss the plan for proceeding. J.A. 447, 504, 508. Present at the briefing were FBI Agents Granger and Paris, their fellow Agents William Vigorito, Nick Elder, and Bruce Perry; Secret Service Agent Alan Vilsick; Chesterfield County Police Sergeant Matthew McCartney, and Chesterfield County Police Officer Daniel Bowen. J.A. 504, 508. Chesterfield County Police Sergeant Russell Granderson arrived shortly thereafter. J.A. 504, 509, 566-67.

Agent Granger conducted the briefing. J.A. 508. She told the assembled officers that the FBI was investigating Raub because he had made on-line threats

9

of violent acts against people, and that the purpose of the investigation was to determine whether Raub was serious about following through with the threats. J.A. 447-48, 508, 560.

It was decided that Agents Paris and Granger would be the only officers who would make direct contact with Raub; all other officers were to form a perimeter around Raub's house. J.A. 504, 508. Paris and Granger then approached the front door which had a screen door with the top screen missing. Id. J.A. 561. When Raub came to the door, Agent Granger told him that they wanted to ask him about some of his Facebook posts. J.A. 508. Raub stood inside the house and behind the screen door while Granger and Paris were outside. J.A. 508-09.

During his 20-25 minute conversation with Granger and Paris, Raub was at times calm, but at other times his emotional state changed rapidly and became very intense, as reflected in both his mannerisms and his speech. J.A. 505, 508-09, 574. Raub gave "every indication" to Granger and Paris that he was serious about the threats he had posted and that the threats were not just empty rhetoric. J.A. 509.

Raub was extremely intense and emotional when responding to questions about his threatening posts. Sometimes, when asked about the posts, he would change the subject to talk about other things, such as his belief that the federal government had fired a missile into the Pentagon on September 11, 2001, and that the Government was dropping radioactive Thorium on American citizens from

10

airplanes. J.A. 505, 508. At one point, when asked directly if he was serious about the threatening posts, he responded "we will all see very soon what all of this means." J.A. 505, 508. While talking with Agent Paris, Raub at times appeared preoccupied and distracted. He would make eye contact with Paris for a few seconds but then his eyes would "rove away." J.A. 576.

As Paris and Granger were concluding their conversation, Paris began to feel dizzy and weak. After stepping off the porch he fainted in the yard.[8] J.A. 505, 509, 561. Paris revived about a minute later and walked to Granger's car, which was parked near Raub's house. J.A. 505, 509.

While sitting in the car, Agents Paris and Granger discussed their concern about Raub's potential to engage in violent acts. Their concern was based on the information provided to them by Lawlor and Bullen, the interview with Raub, Raub's verbal and non-verbal communication, the Facebook threats, and, as Paris phrased it, "a totality of several things." J.A. 435, 452-53. Granger stated "We need to get this guy evaluated. You know we can't leave here without doing something." J.A. 452-53. Paris concurred that they "needed to have [Raub] evaluated." J.A. 419.

At this point, Paris and Granger had determined that they had probable cause

---

[8] Paris believed he fainted because he had worked out that morning with the high school football team he helped coach, had missed lunch and dinner that day, and was dehydrated from the heat and humidity. J.A. 450-51.

to detain Raub pursuant to an ECO under <u>Va. Code</u> § 37.2-808(G).  J.A. 419.  That statute provides:

> A law enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody as stated in this section may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization.[9]

Agent Paris then telephoned the Chesterfield County Emergency Communication Center and requested that someone from the County's Mental Health Crisis Intervention Unit call him. J.A. 505, 509.  Defendant/Appellee Michael Campbell, the individual who would perform the evaluation of Raub as the designee of the community services board, returned Paris' call.[10]  <u>Id.</u>

Agent Paris told Campbell about the FBI and Secret Service investigation of Raub.  J.A. 573.  He also told Campbell that he had just finished interviewing Raub.  <u>Id.</u>  Paris told Campbell that Raub was a former Marine who had threatened violence against other people.  Paris told Campbell that, in Paris' judgment, the threats were sufficiently serious that  he  had  probable  cause  to detain Raub

---

[9]  It is uncontested that Paris and Granger did not seek a written ECO from a magistrate pursuant to <u>Va. Code</u> § 37.2-808(B).

[10]  Campbell is a mental health clinician and a senior certified crisis intervention pre-screener for Chesterfield County Emergency Services.  J.A. 572.  He has been a certified pre-screener since 2006.  J.A. 594.

on an ECO pursuant to Va. Code § 37.2-808(G).[11]   J.A. 573, 575.  Paris told

Campbell that Raub had made online threats to kill people.  J.A. 573.  Paris

described the language of the threats to Campbell, who agreed that they were

specific threats of violence against human beings.  J.A. 573-74.

Paris told Campbell that a veteran who had known Raub in the Marine Corps

had expressed concerns to the FBI that Raub's behavior had recently become

extreme, odd, and unusual.  J.A. 574.  The Marine was concerned that Raub was

the kind of person who might carry out his threats and that he had the knowledge

and experience necessary to do so.  Id.  Paris also told Campbell that Raub might

have access to weapons and explosives.  J.A. 574.

Paris told Campbell that Raub was preoccupied and distracted during the

interview, with rapid mood swings. J.A. 574.  Paris also told Campbell that Raub's

eyes wandered away while he talked.  Id.  These were signs to Campbell that Raub

might have been reacting to an internal stimulus, an indication of psychosis.  Id.

Paris also informed Campbell about Raub's beliefs that the government had

perpetrated the 9/11 attacks and was committing "atrocities" by dropping  a

---

[11]   Paris and Granger were not required to speak with Campbell or any other
mental health professional before they detained Raub for a mental health
evaluation under Va. Code § 37.2-808(G).  Campbell's statutory involvement in
the process did not begin until after Raub was detained and transported to an
"appropriate location" where Campbell could conduct the evaluation.    Va. Code
§§ 37.2-808(B), (G).

13

radioactive substance called Thorium on American citizens from airplanes.[12] J.A. 573.

Campbell concluded that Paris' observations of Raub and the other information he had received confirmed the validity of the concerns which the Marines had reported to the FBI; that Raub's behavior and demeanor were evidence of mental illness; and that Raub, who had a military background in demolition and was thought to have access to weapons, was likely to have the means, knowledge, and expertise. J.A. 575. Campbell concluded that there was ample justification for Paris to bring Raub in for a mental evaluation. Id. Accordingly, he told Paris that he concurred with Paris' decision to have Raub evaluated. Id.

Agent Paris exited Agent Granger's vehicle and informed Sergeant Granderson that he and Officer Bowen were to detain Raub and transport him to be evaluated by a Chesterfield County Crisis Intervention specialist. J.A. 568.

---

[12] Campbell concluded that these beliefs were delusional. J.A. 635-37, 984. Raub's expert, Dr. Martin, opined that "[h]owever ill-grounded these views may be in facts [sic]", they are "political views" and "cannot be the basis for a finding of mental illness." J.A. 833-34. This statement is patently incorrect. Raub's beliefs about 9/11 and Thorium are not political views; they are beliefs that certain events have occurred or are occurring which, as Martin herself concedes, are "ill-grounded" in fact. This is the classic definition of a delusion. The Diagnostic and Statistical Manual of Mental Disorders, vol. 5 ("DSM-V") defines psychotic disorders by one or more of five key features, one of which is delusions. DSM-V at 87, "Delusions".

14

Granderson and Bowen detained Raub and transported him to the Chesterfield County Jail in Officer Bowen's police vehicle.  J.A. 569.

Raub wants this Court to believe that Campbell was the "moving force" behind Paris' decision to detain Raub.  The uncontroverted evidence in the case contradicts Raub's assertion.  Paris made this clear in his deposition:

> Q.    And then what happened?
> A.    Terry [Granger] was just checking on me.  Agent Granger was just checking on me, giving me water…  And we determined – she made the comment to me that, "We need" – "we need to get this guy evaluated.  You know, we can't leave here without doing something."  This is – there was concern of potential violence.
> Q.    And what was that based on?
> A.    Our interview.
> Q.    Anything else?
> A.    It was a lot of what he said verbally and nonverbally, his emotions.  It was a totality of several things.

J.A. 452-53.

> Q.    I understand that.  But your determination that – or your confirmation, if you want to use that, that he was a threat to others was based on the interview you had with Mr. Raub, correct?
> [Objections deleted]
> A.    And the [Bullen] email.  Yes, sir.

J.A. 459-60.

Thus, Paris and Granger had decided that it was necessary to detain

15

Raub before Paris called Campbell.[13]   Paris' decision to discuss Raub with

Campbell, the individual who would evaluate Raub after the police officers

detained and transported him to the Jail, does not convert Paris' decision under Va.

Code § 37.2-808(G) to detain Raub into Campbell's decision.  This is true whether

Campbell characterized his own input as "confirmation" or "guidance".  (Br. of

Appellant at 11.)

Officer Bowen transported Raub to the Jail, where Campbell evaluated Raub

as required by Va. Code §§ 37.2-808 and 809.[14]  Id.  J.A. 514.

During the interview Campbell observed in Raub the same preoccupation,

distractedness, and roving gaze which Agent Paris had described to Campbell

---

[13] Raub's contention that Campbell "has admitted he lacked probable cause" to
detain Raub at Raub's residence because Campbell had not yet read Bullen's email
misses the point.  (Br. of Appellant at 43.)  Paris, not Campbell, was legally
responsible for and made the probable cause determination for the ECO at Raub's
house, and at the time Paris made the ECO determination, Paris had read Bullen's
email.  J.A. 503.

[14] Campbell's job in evaluating Raub was quite different from, and performed
under very different circumstances than, the job performed 14 months later by
Raub's retained psychologist, Dr. Martin.  The district court succinctly described
this difference in footnote 11 of its Memorandum Opinion:

> In reviewing the situation Campbell confronted, it is important to be
> mindful of the public consequences if his decision had been different
> and Raub had decided to gun "whoever run the town."  Dr. Martin's
> thought process was not encumbered by these high stakes.  And,
> unlike Dr. Martin, Campbell did not have the benefit of hindsight.

J.A. 962 (internal citations omitted).

16

when they spoke on the telephone.  J.A. 576, 632-34.  Campbell asked Raub questions which did not register with Raub "and there was a blank, kind of a blank stare."  J.A. 633.  Raub would not make eye contact but would be "kind of looking through" Campbell and then have Campbell ask the question again.  J.A. 633-34. Observing Raub in person strengthened Campbell's opinion that Raub was responding to some internal stimulus, an indication of psychosis.  J.A. 574, 576.

During the conversation, Raub also repeated to Campbell his belief, as previously expressed to Paris, that the 9/11 terror attacks were perpetrated by the United States Government and that the Government was dropping radioactive Thorium on American citizens from planes. J.A. 576, 636. He told Campbell that a revolution was about to begin and that he had been chosen to lead it. J.A. 576, 635. Campbell considered this to be evidence of paranoia and delusional thinking (J.A. 576, 628-31, 634-36):

> I see someone is paranoid when they feel that they are being watched and being marked and being the potential risk that's going on in his mind; that he's going to be this leader of a revolution, that he's been chosen for it and that the United States Government knows this.

J.A. 365.    Campbell also talked with Raub about the specific homicidal threats which Raub had posted and which had caused the law enforcement officers to begin the investigation that led to his detention. J.A. 576.  Campbell asked Raub if he felt justified in following through with those threats.   J.A. 576.   Raub responded, "I certainly do, wouldn't you?"  J.A. 576.

17

Campbell's interview of Raub ended after approximately 15 minutes because Raub refused to answer any more of Campbell's questions.[15]  J.A. 576, 600, 626-28. Campbell then read the Bullen email which Paris had quoted to him earlier but which Campbell had not yet had a chance to read for himself. J.A. 576-78, 590-91, 610. Campbell concluded that the Facebook posts described in Bullen's email were specific homicidal threats, which confirmed that Raub was experiencing "homicidal ideation."  J.A. 629-31, 644-45.  After reading the email and considering it in conjunction with all of the evidence he had obtained from Paris and his own interview and observation of Raub, Campbell concluded that Raub met the standards for Campbell to petition a magistrate for a TDO under Va. Code § 37.2-809 so that Raub could receive further evaluation and treatment in a mental health facility. J.A. 577, 648-53.

Campbell next prepared a Petition for a TDO and attached an eight-page "Prescreening Report", a report Campbell prepared and which contained his clinical mental health findings.  He also attached the email sent to the FBI by Bullen.  J.A. 31-32, 981-990.  Campbell submitted this documentation to Chesterfield County Magistrate M.N. Znotens. J.A. 577.  From this evidence, Magistrate Znotens made a judicial finding that there was probable cause to issue a

---

[15]  Dr. Martin criticizes Campbell for the length of the interview, ignoring the fact that Raub, not Campbell, determined the interview's length when he refused to talk after 15 minutes.  (Br. of Appellant at 19.)  In contrast, Raub permitted Dr. Martin to meet with him for 90 minutes.  J.A. 851.

Temporary Detention Order under Va. Code § 37.2-809 on the grounds that Raub was suffering from mental illness and that as a result of the mental illness there was a substantial likelihood that Raub would, in the near future, cause harm to himself or others. J.A. 33-34. Raub was transported to John Randolph Medical Center for evaluation and treatment.

In the following four days, two mental health professionals at John Randolph, LaTarsha Mason and James A. Correll, PhD, evaluated Raub. Based on their own evaluations, they concurred with Paris' and Campbell's determination that Raub met the standard to be detained for mental health treatment. Accordingly, they petitioned the General District Court of Hopewell for an Involuntary Admission for Treatment pursuant to Va. Code § 37.2-815. J.A. 35-36, 55-56, 310-11.

On August 20, 2012 Special Justice Walter Douglas Stokes held a hearing at which Raub was present and was represented by counsel; two attorneys of the Rutherford Institute also attended the hearing. At the conclusion of the hearing, Special Justice Stokes entered an Order for Treatment for Raub to be treated at the VA Hospital in Salem, Virginia, finding by clear and convincing evidence that Raub had a mental illness and that a substantial likelihood existed that his mental

illness would, in the near future, cause him to harm others.[16]  J.A. 312-15.

Over a month later, on September 28, 2012, John W. Whitehead of the Rutherford Institute wrote a five-page letter to G. Douglas Bevelacqua, Inspector General for Behavioral Health and Developmental Services, Office of the State Inspector General, in which Whitehead challenged the actions of the various law enforcement and mental health officials who dealt with Raub from August 16 – 20. J.A. 379-83.  On October 4, 2012, Michael F.A. Morehart, the State Inspector General, responded to Whitehead. J.A. 384-85.  Morehart concluded from a review of the facts that "those responsible for [Raub's] evaluation could have been guilty of 'neglect', as defined by [Va.] Code § 37.2-100, if they had failed to provide the services needed for his health, safety and welfare."  J.A. 385.

### Statement of Material Proceedings

The Complaint Raub filed in May, 2013 claimed that two named Chesterfield County police officers (Granderson and Bowen), ten John Doe FBI, Secret Service, and other law enforcement officials, and three mental health professionals (LaTarsha Mason, Lloyd Chaser, and Campbell) "unlawfully seized" Raub in violation of the Fourth Amendment when Raub was detained pursuant to

---

[16]  Raub was later released by a Judge of the Circuit Court of the City of Hopewell because the mental health professionals at John Randolph Hospital had failed to check some boxes on the petition form which they filed with the General District Court.  J.A. 35-36.

1) the ECO ordered by Agent Paris, 2) the TDO issued by Magistrate Znotens, and 3) the Order of Treatment entered by Special Justice Stokes. J.A. 16-44. Raub claimed that "the actions against Raub" were taken as part of a program named "Operation Vigilant Eagle" which "calls for surveillance of military veterans" in order to "ferret out disgruntled American veterans who criticize the government." J.A. 24-26 at ¶¶ 49-56. Raub contended that the Defendants' actions "were an effort to discredit, silence and punish Raub" for his "political speech" by making "the pretextual and false allegation that Raub was suffering from a mental illness and was subject to involuntary commitment under Virginia law" in violation of the free speech and free expression provisions of the First Amendment. J.A. 27. Soon after filing the lawsuit, Raub dismissed Chaser because Chaser had taken no part in any of the events alleged in the Complaint and was actually on vacation during the entire time that Raub was detained. J.A. 57-64, 68.

Raub attached as an exhibit to the Complaint a two-page form, which was only a small portion of the Petition for the TDO which Campbell submitted to Magistrate Znotens. Raub failed to include, as part of the exhibit, Campbell's Prescreening Report and Bullen's email, both of which were part of the Petition. The Chesterfield Defendants (Granderson, Bowen, and Campbell), submitted both the Prescreening Report and the Bullen email for the district court's consideration in support of the Rule 12(b)(6) Motion to Dismiss which they filed in response to

21

the Complaint. J.A. 45-48, 65-67, 980-90. The Defendants argued that the facts detailed in the Report and the email made it objectively reasonable for the Chesterfield Defendants to have taken the action they did and that, in any regard, the Defendants could not reasonably have believed that their actions would violate Raub's constitutional rights, thus making them qualifiedly immune. J.A. 45-48, 981-90.

The district court concluded that it could not consider – at the Rule 12(b)(6) stage – the Prescreening Report and Bullen email because Raub was contesting their authenticity and because the record, at that stage, did not establish whether the Defendants knew, at the time Raub was first detained, about the Bullen email or the threatening posts quoted in it. J.A. 117-18 at n. 2. The court denied the Motion to Dismiss because at that stage in the litigation "the Court is simply without enough information to determine what the County Defendants knew" at the time Raub's initial detention occurred. J.A. 132.

Although the trial court denied the Motion to Dismiss, it did grant Raub's motion for expedited discovery on the issues which were relevant to the Defendants' qualified immunity defense. J.A. 110-12, 142-44. The trial court urged Raub's counsel to add all other necessary parties "with haste" and referred all discovery issues to Magistrate Judge M. Hannah Lauck for disposition. J.A. 121-22 at n. 6., 145, 206-07.

22

Raub later moved the court to be allowed to depose both Agent Paris and Campbell. Since Agent Paris had not yet been named as a defendant, it was not clear who would represent him if he were deposed.[17] At a hearing before Judge Lauck, the court expressed to Raub's counsel her discomfort with the difficult position in which Paris would be placed if he, as a key player in Raub's detention, were deposed when it was likely that he would shortly be added to the lawsuit as a defendant.[18] Judge Lauck informed Raub's counsel that she would permit the deposition to be taken, but that Paris would first need to be made a party to the lawsuit. Raub's counsel agreed to join Paris as a party before Paris was deposed. J.A. 207-08.

Raub subsequently filed his First Amended Complaint, adding Agents Paris and Granger (who had conducted the interview of Raub along with Paris) as Defendants. J.A. 292-304. Significantly, the First Amended Complaint alleged that the decision to detain Raub at his home on the ECO was a decision made by

---

[17] Raub asserts that Chesterfield County and the FBI were "squabbling" over who would represent Paris at a deposition. This is not true. Paris' representation had not yet been determined at the time of the hearing because the U.S. Attorney's Office had only been made aware of the case a few days earlier and had not yet had a chance to decide whether the Office would represent Paris. J.A. 235-36.

[18] Although Raub now contends that Campbell alone was responsible for Raub's detention, Raub's counsel repeatedly informed Judge Lauck that Agent Paris was a "key" figure in Raub's detention and acknowledged the importance of adding Paris, who was "John Doe 1" in the Original Complaint, as a named defendant in the lawsuit. J.A. 20, 204-05.

23

Paris, either by himself or jointly with Granger, and that the detention of Raub at his home was done "upon the order or request of Paris and or Granger", not Campbell. J.A. 296 at ¶¶ 20, 21. The First Amended Complaint did not allege that Campbell made the decision to detain Raub, or that Campbell requested Raub's detention. J.A. 292-304. The First Amended Complaint also dropped all allegations and references to "Operation Vigilant Eagle." Id.

At the close of discovery – after depositions had been taken, after the County Defendants had responded to Raub's interrogatories and requests for production, and after all relevant documents, including the Prescreening Report and the Bullen email, had been authenticated – the County Defendants (Bowen, Granderson, and Campbell) filed a Motion for Summary Judgment, on the ground that they were entitled to qualified immunity since they could not reasonably have believed that their actions violated Raub's constitutional rights. J.A. 346-48, 349-706. Nine days later, Raub dismissed with prejudice all claims against Bowen, Granderson, Agent Paris, Agent Granger, and the remaining John Doe law enforcement officials, leaving Campbell as the only Defendant. J.A. 707.

The court granted Raub additional time to file his response to the summary judgment motion, and subsequently permitted Raub to file not only an opposition memorandum but a supplemental memorandum in opposition to summary judgment as well. J.A. 13. However, Raub did not submit any affidavits,

documents, or other evidence in response to the Chesterfield Defendants' summary judgment motion, not even his own affidavit.[19]

The district court heard argument on the Motion for Summary Judgment of Campbell, the sole remaining Defendant, on February 18, 2014 and issued its Memorandum Opinion and Order granting the motion on February 28.  J.A. 948-75, 976.  Noting the "absence of authority squarely on point" from the United States Court of Appeals for the Fourth Circuit or any lower court within the Fourth Circuit (J.A. 964) the court analogized the cases involving law enforcement officers, not mental health clinicians, who detain individuals for mental health evaluations. J.A. 964-69. The court was careful to note, however, that, unlike police officers, "Campbell had no statutory power to detain [Raub] – only to evaluate and recommend." J.A. 964.

The court found that Campbell "was able to particularize the factual basis" for the conclusions in his Prescreening Report, "including specific comments by Raub" which were contained in the Bullen email; that Paris had reported the content of the email to Campbell; and that Campbell had seen the email and interviewed Raub face-to-face at the Jail.  J.A. 696, 952-56. Accordingly, the court found Campbell's actions to be objectively reasonable, particularly since the

---

[19] After the Motion for Summary was filed but before it was argued, Raub was granted leave to file the Second Amended Complaint which dismissed a Bivens claim and listed Campbell as the only Defendant.  J.A. 803-04, 806-07.

circumstances required Campbell to make an immediate decision within the statutorily mandated time frame. J.A. 696. The court also rejected Raub's First Amendment claim since it was undisputed that Campbell's decision to petition Magistrate Znotens was based on the threats Raub was making, not on "political speech". J.A. 970.

Concerning the opinion of Dr. Martin, on which Raub principally relied, the court stated that "[t]he fact that [Raub's] expert drew different conclusions than Campbell adds little impetus to his argument" because qualified immunity "turns on the perspective of the public official whose actions are under review." J.A. 974. Dr. Martin's diagnosis of Raub (based on a single interview conducted 14 months after the events of August 16, 2012) "did not preclude a finding that detention for a mental evaluation was objectively reasonable." Id. And that finding, wrote the court, is necessarily dependent on the circumstances faced by Campbell at the time he acted:

> Here, context is important. In stressful situations where lives are potentially at risk, public safety officials are frequently called upon to make tough decisions. Some involve close calls based on scant information hastily gathered. But duty still demands decisive action – citizens expect no less. That's why the law affords such officials reasonable room to exercise guided discretion and a safe harbor from litigation waged by persons who, in retrospect, may have acted differently.

Id. In its ruling, the court also noted that this Court, in both Gooden v. Howard County, Maryland, 945 F.2d 960 (4th Cir. 1991) (en banc) and S.P. v. The City of

26

Takoma Park, Md., 134 F.3d 260 (4th Cir. 1998), found that a detention for a mental evaluation was objectively reasonable even though the plaintiffs in those cases were diagnosed soon after their detentions as being neither mentally ill nor a danger to themselves or others.

## Summary of the Argument

The uncontested evidence in this case establishes that Campbell could not have reasonably believed that he violated any of Raub's clearly established First or Fourth Amendment rights. Therefore, he is entitled to summary judgment on his qualified immunity defense. Anderson v. Creighton, 457 U.S. 635, 641 (1987).

Campbell cannot be liable for Raub's Fourth Amendment claim for four reasons. First, Campbell did not ever seize Raub. Raub was detained at his residence by Agents Paris and Granger pursuant to Va. Code § 37.2-808(G), which gives only law enforcement officials the authority to detain individuals for a mental health evaluation under an ECO. Under § 37.2-808(G), mental health professionals such as Campbell play no part in the ECO process. The facts of the case bear this out. In his deposition, Agent Paris testified that when he and Agent Granger first returned to Agent Granger's automobile to discuss their interview with Raub, Granger told Paris "We need to get this guy evaluated. You know, we can't leave here without doing something." J.A. 452-53. Paris concurred with Granger's determination. J.A. 419. Paris did not even telephone Campbell until

27

after this conversation, confirming that Granger's and Paris' decision to detain Raub had already occurred.

Campbell also did not detain Raub at the Jail pursuant to a TDO. The detention was effected by Magistrate Znotens when he issued the TDO, pursuant to his authority under Va. Code § 37.2-809. Campbell's involvement was to prepare a petition for Magistrate Znotens' review. Campbell cannot be liable for his preparation of that petition unless he intentionally and dishonestly misled the Magistrate by including knowingly false information in the Petition. Davis v. Bacigalupi, 711 F. Supp. 2d. 609, 620 (E.D. Va. 2010). There is no evidence to support a claim that Campbell intentionally lied to Magistrate Znotens in order to unlawfully obtain the TDO.

Second, there is no case law in this Circuit which would provide guidance to Campbell on the standard for determining probable cause to detain an individual for a mental health evaluation. Raub himself recognized this in his docketing statement, in which he admitted that this is a case of first impression in this Court. (Doc. 12-1 at 2.) The trial court also acknowledged the "absence of authority squarely on point" in its Memorandum Opinion. Given the lack of guidance, Campbell could only have guessed at the constitutional standard which would govern his decision. However, Campbell cannot be held liable "for bad guesses in gray areas." Takoma Park, 134 F.3d at 266. He may only be held liable for

28

"transgressing bright lines." Id. Neither the Supreme Court nor this Court have established any bright lines for mental health clinicians such as Campbell whose evaluations are mandated by Va. Code §§ 37.2-808 and 809.

Third, even when Campbell's conduct is measured against the standard established by this Court for police officers who detain individuals for mental health evaluations, Campbell's conduct is constitutionally appropriate. In Takoma Park and Gooden, this Court found qualified immunity proper for police officers who were called to a residence and concluded, based upon their own observations and interviews, that the individual needed to be detained because she seemed to be suffering from a mental illness and appeared to be a danger to herself or others. In this case, Agents Paris and Granger, and later Campbell himself, all corroborated the reports made by Raub's two Marine friends that Raub was not acting like himself, and that he was making threats of violent harm against individual human beings that he might carry out in the immediate future.

Fourth, Raub has presented no evidence to contradict the undisputed facts of this case as established by Campbell, Paris, and the Chesterfield County police officers. Similar to Takoma Park and Gooden, the subsequent clinical finding of no mental illness by a psychologist, like Dr. Catherine Martin, bears no weight on the qualified immunity question of whether the perceptions of Campbell were reasonable based on the circumstance he faced at the time he conducted his

29

statutorily mandated evaluation.  J.A. 966-67, 974.

The fact remains that this Court has never established a constitutional standard to govern Campbell's conduct, and Dr. Martin's opinion cannot impose such a standard after the fact.  Nor can Dr. Martin's opinion alter (1) the fact that the law enforcement officials at Raub's residence detained Raub under an ECO, not Campbell; and (2) the fact that Magistrate Znotens ordered Raub to be detained under a TDO, not Campbell.

Raub's First Amendment claim also must fail.  The uncontested facts establish that Raub was not detained because of "political" speech, but because of his mental illness and violent threats.  Moreover, under Reichle v. Howards, 132 S. Ct. 2088 (2012), it is not clearly established that a cognizable claim for a retaliatory arrest can be asserted when the arrest is supported by probable cause.  In this case, probable cause existed for Raub's detention, as determined by Magistrate Znotens.  This Court's recent decision in Tobey v. Jones, 706 F.3d 379 (4th Cir. 2013) also supports dismissal of Raub's First Amendment claim.  In Tobey this Court allowed a First Amendment claim of retaliatory arrest to survive a motion to dismiss only because the complaint was "replete" with specific factual allegations that supported Tobey's contention that the defendants lacked probable cause to arrest him.  Here, the evidence submitted by Campbell is sufficient to establish the existence of probable cause and to support his Petition to Magistrate Znotens.

Finally, Raub is not entitled to an injunction against Campbell because Campbell has not violated any of Raub's constitutionally protected rights, and because there is no evidence to support the contention that Campbell will violate any of Raub's constitutional rights in the future. Los Angeles v. Lyons, 461 U.S. 95, 113 (1983).

## Argument

### Standard of Review

This Court reviews de novo a district court's order granting summary judgment on the basis of qualified immunity. Ross v. Early, 746 F.3d 546, 552 (4th Cir. 2014). Qualified immunity is typically an immunity from suit, rather than a mere defense to liability, and is effectively lost if a case is erroneously permitted to go to trial. Cloaninger v. McDevitt, 555 F.3d 324, 330 (4th Cir. 2011) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Summary judgment should be granted when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. FED. R. CIV. P. 56(c). However, factual findings are ordinarily not necessary to the analysis of a qualified immunity claim because the issue is a purely legal one: whether the facts alleged support a claim of a violation of clearly established law. Mitchell, 472 U.S. at 528 n. 9.

The doctrine of qualified immunity "balances two important interests - the

31

need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The qualified immunity defense "protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ross, 746 F.3d at 560 (internal citations omitted); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Consequently, "[i]n determining whether a defendant is entitled to qualified immunity, [this Court] must decide (1) whether the defendant has violated a constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct." Ross, 746 F.3d at 560 (internal citations omitted).

"[T]he immunity is to be applied with due respect for the perspective of [a mental health clinician] on the scene and not with the greater leisure and acquired wisdom of judicial hindsight." Gooden, 954 F.2d at 964-65. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Takoma Park, 134 F.3d at 266. The standard is one of objective reasonableness: "whether a reasonable [mental health clinician] could have believed [the conduct at issue] to be lawful, in light of clearly established law and the information [he] possessed." Anderson, 457 U.S. at 641.

In order for a constitutional right to be clearly established, "its contours 'must be sufficiently clear in the controlling law that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful…, but it is to say that in light of pre-existing law the unlawfulness must be apparent.'"  Jones v. Buchanan, 325 F.3d 520, 531 (4th Cir. 2003).

Raub also appeals the district court's denial of injunctive relief.  The commonly stated rule is that the grant or denial of injunctive relief is reviewable under the abuse of discretion standard.  Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 814 (4th Cir. 1991).

**1.  Campbell Is Entitled To Summary Judgment Based On Qualified Immunity To Raub's Fourth Amendment Claim Because Campbell Did Not Violate Any Of Raub's Clearly Established Constitutional Rights Of Which He Could Reasonably Have Known.[20]**

      **A.  Campbell cannot be held liable for Raub's Fourth Amendment claim because Campbell never seized Raub.**

The facts of this case establish that when Raub was detained at his residence on August 16, 2012, he was detained by law enforcement officials who were

---

[20]  In his Opening Brief, Raub acknowledges that the Fifth and Fourteenth Amendment claims asserted in his Second Amended Complaint are part and parcel of his Fourth Amendment seizure claim.  (Br. of Appellant at 6.)  All of these claims will be addressed together in this Brief as part of Campbell's Fourth Amendment argument.

executing a warrantless ECO. The uncontradicted evidence establishes that Officer Bowen and Sergeant Granderson seized Raub in response to a command from Agent Paris that they do so. J.A. 561, 568. Campbell was not even present when Raub was seized.

Campbell had no legal ability to detain Raub under an ECO in any regard. Va. Code § 37.2-808(G) gives only law enforcement officials the Authority to detain an individual for an ECO without a warrant first being issued:

> A law enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody as stated in this section may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization.

Raub cannot avoid this legal and factual reality with an unsupported assertion that Campbell, not Agents Paris and Granger, "decided" to detain Raub. (Br. of Appellant at 42.) The record establishes, to the contrary, that Paris and Granger had already decided to detain Raub before Paris called Campbell. J.A. 419, 452-53. Paris testified in his deposition that when he and Agent Granger first returned to Granger's automobile after concluding their interview of Raub, Granger said to Paris "We need to get this guy evaluated. You know we can't leave here without doing something." J.A. 419, 452-53. Paris concurred that they "needed to have [Raub] evaluated." J.A. 419. At the time of this conversation Paris had not yet contacted Campbell.

Additionally, Campbell could not, as a matter of law, make the decision to detain Raub pursuant to a TDO. That decision was made by Magistrate Znotens, the only person with the legal authority to order Raub's further detention. Va. Code § 37.2-809(B). Campbell could only be held liable for Magistrate Znotens' probable cause determination if Campbell conveyed "false and 'intentionally deceptive' information to [the Magistrate] to obtain the [TDO]." Davis, 711 F. Supp. 2d at 620. In other words, under Davis, Raub was required to establish that Campbell "intentionally lied" to Magistrate Znotens in order to unlawfully obtain the TDO. There is no evidence in the record to support such a contention. In the absence of any such evidence, Campbell cannot be held liable for Magistrate Znotens' decision to detain Raub.

**B.    There is no case law in this Circuit which would provide guidance to a mental health official, acting pursuant to Va. Code §§ 37.2-808 and 809, on the standard for determining probable cause for detaining an individual for mental health evaluation or treatment.**

This is a case of first impression in this Court. (Doc. 12-1 at 2.) The trial court acknowledged in its Memorandum Opinion granting summary judgment "the absence of authority squarely on point" and stated further that "[t]he standard for determining whether a person poses a serious threat of public danger is an inexact science, hence, a quintessentially gray area." J.A. 961, 964. There is no law in this Circuit which sets forth the standard by which a mental health official, operating under stressful circumstances and legally mandated time constraints, should

35

determine he has sufficient evidence to conclude that an individual is mentally ill and poses a significant risk of harm to himself or others, so that it is objectively reasonable for him to petition (or not petition) a magistrate for a TDO.

Given this lack of guidance, Campbell could only guess at the constitutional standard which would govern his decisions.  He acted in a manner that he believed was consistent with his obligations under the laws of the Commonwealth and in a manner that would strike an objective observer as falling within the range of reasonable judgment.  <u>Gooden</u>, 954 F.2d at 965.  As this Court has held, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." <u>Takoma Park</u>, 134 F.3d at 266.

**C.    Campbell's conduct and decisions meet the standard established by this Court for law enforcement officers who detain individuals for mental health evaluations.**

Since there is no law establishing the constitutional standard which governs mental health officials who petition a magistrate for a TDO, the district court analyzed Campbell's conduct against the standard established by this Court for evaluating the actions of law enforcement officials (such as Agent Paris) who detain a person under an ECO.  J.A. 963. Employing that standard, the district court properly found that Campbell's actions were objectively reasonable and therefore constitutionally appropriate. J.A. 974.

The information which Raub's Marine friends supplied to the FBI, and

which Paris then communicated to Campbell, demonstrated that Raub, a trained ex-Marine, was posting messages that were "not him". J.A. 989-90. Raub was threatening to kill people as part of a "Revolution" he was going to lead. J.A. 989-90. He posted that these events were imminent and that they were "the start of you dying". J.A. 989. Based on this information, Paris and Granger properly interviewed Raub to determine if he represented a real and immediate threat to public safety. After they completed the interview, they concluded that Raub needed to be evaluated by a mental health professional and ordered him to be detained under Va. Code § 37.2-808(G). J.A. 419, 452-53.

After Campbell later interviewed and evaluated Raub in person and reviewed all of the available documentation on Raub's threats, Campbell petitioned the magistrate for a TDO. J.A. 575-77. Campbell testified that he made the decision to petition Magistrate Znotens for a TDO because of the homicidal threats Raub had made; because Raub's behavior was demonstrably "unpredictable"; because Raub was psychotic and needed further evaluation and treatment; because there was a substantial risk that Raub would carry out his threats in the near future; and because Raub had both the training and the capability to carry out his threats at any time. J.A. 575-77, 981-90.

The foregoing facts, drawn from the depositions, sworn statements, exhibits, and Prescreening Report, establish that probable cause existed to believe

37

that Raub was mentally ill, represented a danger to others, and needed further mental health services. This is precisely what Magistrate Znotens concluded when he issued the TDO. Accordingly, Campbell's actions were proper, and he could not have reasonably believed under these circumstances that the detention of Raub violated Raub's constitutionally-protected rights. Gooden, 954 F.2d at 966; Takoma Park, 134 F.3d at 264-67.

The case of S.P. v. The City of Takoma Park, Md., 134 F.3d. 260 (4th Cir. 1998) is instructive. In Takoma Park, Mr. Peller had been arguing with his wife and called an information number seeking a "mental health hot-line" number to call. Id. at 264. The information operator had no such listing so Peller called the police non-emergency number for "referral to a marriage counselor." Id. The call was transferred to a police emergency dispatcher who sent police officers to the Peller residence to investigate. The dispatcher characterized Ms. Peller as a "possible suicidal person." Id.

When officers arrived at the residence, Ms. Peller was agitated and crying. Id. Ms. Peller told the officers that she had had a "painful argument" and "if it were not for her kids she would end her life." Id. The officers concluded that Ms. Peller should be detained for an emergency mental health evaluation. Id. Ms. Peller disagreed and the officers handcuffed her and transported her to Washington Adventist Hospital ("WAH"). Two emergency room doctors evaluated Ms. Peller

38

and concluded that she was a danger to herself. She was then admitted involuntarily to WAH.

The following evening, WAH's attending psychiatrist determined that Ms. Peller was not suicidal nor suffering from any other mental disorder; he released Ms. Peller. Id. at 264-65. She later sued the police officers who had detained her, claiming a violation of her Fourth Amendment rights. Id. at 265-8. The district court held that, despite the subsequent opinion of WAH's psychiatrist, the officers had probable cause to detain Ms. Peller and could not reasonably have known that their conduct violated Ms. Peller's clearly established constitutional rights. Id. They were therefore entitled to qualified immunity under Harlow v. Fitzgerald. Id.

In reaching the Takoma Park decision, this Court cited and discussed its decision in Gooden v. Howard County, Md., 954 F.2d 960 (4th Cir. 1992) (en banc). In Gooden, the police were called to investigate a report of screams coming from an apartment rented by Gooden. Id. at 962. When questioned, Gooden reported that she had been asleep and had no idea she had been screaming. A week later, a second report of screams was made and police again interviewed Gooden. Officers found her responses to be "vague and evasive" (although she denied making the screams). Id. at 963. Concluding that she might be a danger to herself, the officers detained her for an emergency mental evaluation. Id. The examining physician found no evidence of mental illness and released Gooden. Id.

at 964.  Gooden sued the officers claiming a violation of her Fourth Amendment rights.  The district court declined to grant the officers qualified immunity but this Court, sitting en banc, reversed.  Id. at 965.

In Gooden, the defendants were acting pursuant to a Maryland standard similar to the Virginia standard set forth in Va. Code §§ 37.2-808 and 37.2-809. Under the facts presented to the officers, the Court concluded that the officers were entitled to qualified immunity because they could not reasonably have believed that they lacked probable cause to temporarily detain Gooden.  The en banc Court emphasized that the standard to be used in assessing the officers' qualified immunity defense is not "the clinical correctness of the officers' perceptions, but whether their perceptions were reasonable" under the circumstances.  Id. at 965, 969.

After its discussion of the Gooden case, the Court in Takoma Park went further and determined that the decision in Gooden not only authorized the seizure of Ms. Peller as a reasonable action, but that the seizure was a judicious action for the officers to have taken:

> Reasonable officers, relying upon our decision in Gooden and the other circuit court decisions addressing similar situations, would have concluded that involuntarily detaining [Ms. Peller] was not only reasonable but prudent.

Takoma Park, 134 F.3d at 267.  The Court in Takoma Park then concluded that the officers were entitled to qualified immunity because "[a]s in Gooden, these officers

were responding to an emergency call from a concerned third-party alerting them of a potentially dangerous situation." Id. It was immaterial to that analysis that another mental health professional concluded soon after Ms. Peller's detention that Ms. Peller was neither mentally ill nor a danger to herself or the community. Id.

In the present case, two of Raub's Marine friends contacted the FBI because of threatening Facebook posts made by Raub. J.A. 989-90. The posts were set out verbatim in an email to the FBI from one of the Marines (Howard Bullen) and Agent Paris described them to Campbell in their telephone call. Id. The record establishes that Campbell reached his decision to Petition Magistrate Znotens for a Temporary Detention Order based on the information he obtained from Paris, Campbell's own face-to-face interview of Raub conducted at the Jail in accordance with Va. Code § 37.2-809, Raub's Facebook posts, and the observations of Raub's Marine friends. J.A. 572-78, 981-90. Campbell concluded that Raub was psychotic and delusional and was a threat to others. Id. The Magistrate then considered the evidence, independently confirmed that Raub should be hospitalized, and issued a TDO.[21] J.A. 33.

As in Gooden and Takoma Park, Campbell was "responding to an

---

[21]    The Magistrate's decision was subsequently confirmed by the Special Justice who concluded "by clear and convincing evidence" that Raub had a mental illness and that there was a substantial likelihood that he would "in the near future, cause harm to others as evidenced by recent behavior causing, attempting or threatening harm and other relevant information." J.A. 23.

emergency" from a "concerned third-party" which alerted him to a "potentially dangerous situation." Accordingly, as the Fourth Circuit held in both <u>Gooden</u> and <u>Takoma Park</u>, Campbell is entitled to qualified immunity on Raub's Fourth Amendment claim because Campbell could not have believed that petitioning a magistrate for a TDO pursuant to valid state statutes, while acting in his capacity as a designee of the community services board, would violate Raub's constitutional rights.

**D.    The subsequent clinical opinions reached by a retained, testifying expert do not change the qualified immunity analysis and material facts by which Campbell is judged.**

The undisputed facts in this case are established by the sworn statements, depositions, and exhibits submitted by Campbell in support of his motion for summary judgment. J.A. 346-48, 355-64.  Raub submitted no evidence which contradicts Paris' testimony or the Bullen email about the homicidal nature of Raub's threats; no evidence which contradicts Paris testimony about Raub's bizarre and erratic behavior, and his refusal to renounce his threats when Paris and Granger interviewed him; no evidence which contradicts Paris and Campbell's description of their telephone conversation in which Paris briefed Campbell on Raub's threats and conduct; no evidence which contradicts Campbell's description of Raub's erratic behavior when Campbell interviewed Raub at the Jail; and no evidence which contradicts Raub's refusal to renounce his threats during

42

Campbell's interview of Raub.

The opinion of Dr. Martin, issued 14 months after Raub's detention and the only thing on which Raub relies in trying to avoid summary judgment, does not in any way change these uncontradicted facts.  See Gooden, 954 F.2d 964-66; Takoma Park, 134 F.3d 264-65.  Nor can Dr. Martin's opinion change the fact that this is a case of first impression in this Court or that, under Takoma Park and Gooden, the most readily analogous legal standard, Campbell's behavior was constitutionally appropriate.

Dr. Martin's opinion also cannot alter the fact that, as a matter of fact and law, Agent Paris, Sergeant Granderson, and Officer Bowen detained Raub at his house under an ECO, not Campbell. See supra at 15-17, 36-38;  Va. Code § 37.2-808.  Similarly, Dr. Martin's opinion cannot change the fact that as a matter of law, Magistrate Znotens detained Raub under a TDO after Campbell interviewed Raub at the Jail.  See supra at 20, 37-38; Va. Code § 37.2-809.  Moreover, under Davis v. Bacigalupi, Campbell cannot be held liable for that detention  because  there is no evidence that Campbell intentionally misled Magistrate Znotens by providing him with knowingly false information.

Dr. Martin's opinion in 2013 that Raub was not mentally ill when he was seized in 2012 has no effect on this Court's decision under Gooden and Takoma Park, which held that the seizure of an individual for a mental health evaluation did

43

not violate the constitution even though other mental health professionals later opined that the individual was not mentally ill at the time of the detention. See Gooden, 954 F.2d at 964-66; Takoma Park, 134 F.3d at 264-65.

Raub apparently believes that he can avoid summary judgment in a qualified immunity case – when the facts are uncontested and there is no settled law – merely by submitting a contrary opinion from one more mental health professional. However, as the trial court observed in its Memorandum Opinion, Raub's reliance on Dr. Martin's opinion loses sight of the fact that the case is in a qualified immunity posture. On qualified immunity, the determination of liability turns on the perspective of the public official whose actions are being reviewed and the circumstances that the official was facing at the time. Gooden, 954 F.2d at 965-66. The fact that Martin reached a different conclusion, in the district court's words, "adds little impetus" to Raub's argument. J.A. 974.

## 2. Campbell Is Entitled To Qualified Immunity On Raub's First Amendment Claim.

Raub pled in his Second Amended Complaint that Campbell violated his First Amendment rights by taking action to suppress, discredit, silence, and punish Raub for Raub's "unorthodox political statements". (Br. of Appellant at 50.) J.A. 816. The facts establish that Raub was detained not by Campbell but by law enforcement officers, a magistrate, and a special justice. The facts also establish that Campbell determined that Raub met the statutory TDO criteria because Raub

44

was mentally ill and posed a significant threat to others in the near future, not because of Raub's "political" views. Moreover, as recently as 2012, the United States Supreme Court held in <u>Reichle v. Howards</u>, 132 S. Ct. 2088 (2012) that it was not clearly established that a cognizable claim for a retaliatory arrest in violation of the First Amendment can be asserted when the arrest is supported by probable cause. <u>Id.</u> at 2097. As the Court stated: "This Court has never held" that there is a First Amendment right to be free from a seizure "that is otherwise supported by probable cause." <u>Id.</u> at 2094.

This Court's recent decision in <u>Tobey v. Jones</u>, 706 F.3d 379 (4th Cir. 2013) also supports dismissal of Raub's First Amendment claim. The plaintiff, Tobey, brought a 42 U.S.C. § 1983 action against state officials (Richmond Airport police) and a <u>Bivens</u> claim against federal officials (TSA agents) alleging that these officials retaliated against Tobey by arresting him for "creating a public disturbance." <u>Id.</u> at 384. During an airport security screening, the complaint alleged, Tobey had calmly removed his shirt and his sweat pants (leaving him wearing nothing but a pair of running shorts) revealing that the text of the Fourth Amendment was written on his chest. <u>Id.</u> Tobey alleged that his behavior was not disruptive and that the officials wrongfully arrested him for "creating a public disturbance." Tobey contended, <u>inter alia</u>, that his First Amendment rights had been violated because his actions created no disturbance at all.

45

The defendants filed a motion to dismiss Tobey's First Amendment claim on the grounds that they were qualifiedly immune from liability because they did not violate any of Tobey's clearly established constitutional rights. The district court held that the First Amendment claim could survive a motion to dismiss because there were significant factual disputes concerning whether there was probable cause for the defendants to arrest Tobey at all. Id. at 385.

This Court affirmed the district court, holding that since Tobey's complaint was replete with specific factual allegations that supported Tobey's contention that the defendants lacked probable cause to arrest him, Tobey must be given the chance to prove his First Amendment claim. Id. at 389-90. The Court found that the Supreme Court's decision in Reichle was not controlling in Tobey because in Reichle, unlike in Tobey, there were sufficient facts in the record to establish that probable cause had existed to arrest the plaintiff at the time that he was seized. This Court emphasized however that "it was not clearly established that a plaintiff could make out a cognizable First Amendment claim for an arrest that was supported by probable cause." Id. at 392.

In this case, the factual record establishes that Campbell had probable cause to conclude that Raub was mentally ill and should be detained for a psychiatric evaluation. J.A. 572-79, 981-90. Under the holdings in Takoma Park and Gooden, Campbell reasonably concluded, based on Raub's Facebook postings, the concerns

46

expressed by Raub's Marine friends, the face-to-face interview between law enforcement officials and Raub, and Campbell's own psychiatric evaluation of Raub, that he would have been "derelict in his duty" had he not taken action to ensure that Raub received a further psychiatric evaluation.[22]  Id.  See Gooden, 954 F.2d at 967.  J.A. 384-85.  Raub cannot overcome the holdings in Takoma Park and Gooden with the conclusory contention that Campbell "lacked probable cause".  See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002).

When faced with mental illness and a substantial likelihood that the illness will result in harm to others, law enforcement officers and magistrates are obligated to detain the mentally ill person and have him evaluated.  This is true irrespective of the First Amendment right of the individual to express dissent from government policies and actions.  As the Tobey court stated:  "To be sure, causation is a requirement of a First Amendment retaliation claim.  As we said in Huang, 'the causation requirement is rigorous'; it is not enough that the protected expression played a role or was a motivating factor in that retaliation; claimant must show that 'but for' the protected expression the [government official] would

---

[22]  The Court can take judicial notice of the fact that the Raub incident occurred less than a month after the Aurora, Colorado movie theater shooting incident.  As the Court stated in Gooden, had the defendants done nothing – and the plaintiff had hurt someone – the consequences "may have been irremediable."  954 F.2d at 967.

not have taken the action." Tobey, 706 F.3d at 390. Here, Campbell properly concluded that probable cause existed to detain Raub – a determination which was confirmed by both a magistrate and subsequently by a special justice. He acted in accordance with the state law by petitioning for a TDO and Raub was legitimately detained by order of Magistrate Znotens. The district court properly granted summary judgment to Campbell on Raub's First Amendment claim.

**3.    Raub Is Not Entitled To An Injunction Against Campbell Because Campbell Has Not Violated Any Of Raub's Constitutional Rights, And There Is No Evidence To Support The Contention That He Will Violate Any Of Raub's Constitutional Rights In The Future.**

Raub failed to establish that Campbell violated any of his constitutional rights, and failed to introduce any evidence which would indicate the likelihood of Campbell violating his constitutional rights in the future. Accordingly, Raub was not entitled to injunctive relief against Campbell. Los Angeles v. Lyons, 461 U.S. 95, 113 (1983). Moreover, as the district court correctly noted, it is impossible to foretell the mindset of Raub, or his future behavior. J.A. 972-73. To restrain the actions of officials in the future, if they are faced with similar threatening behavior or words from Raub, is contrary to the public interest. Id. It is not appropriate to enjoin public officials in such situation. Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 161 (2010). Federal injunctive relief is an extreme remedy granted in only the most compelling circumstances. Simmons v. Poe, 47 F.3d 1370, 1382 (4th Cir. 1995). This is not such a case.

## Conclusion

Based on undisputed facts, the district court properly held that Michael Campbell was entitled to qualified immunity and properly dismissed Raub's Second Amended Complaint in its entirety. Campbell respectfully requests that this Court affirm the decision of the district court.

MICHAEL CAMPBELL

By:    */s/ Jeffrey L. Mincks*
                  Counsel

Jeffrey L. Mincks, VSB #18317
County Attorney
Stylian P. Parthemos, VSB #17360
Deputy County Attorney
Julie A. C. Seyfarth, VSB #46207
Assistant County Attorney
Counsel for Michael Campbell
P. O. Box 40
Chesterfield, VA  23832
Telephone  (804) 748-1491
Facsimile   (804) 717-6297
mincksj@chesterfield.gov

49

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>14-1277</u>    **Caption:** <u>Brandon Raub v. Michael Campbell</u>

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains <u>11,953</u> [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2010</u> [*identify word processing program*] in <u>Times New Roman, 14 point</u> [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) <u>Jeffrey L. Mincks</u>

Attorney for <u>MICHAEL CAMPBELL</u>

Dated: <u>9/25/2014</u>

50

## CERTIFICATE OF SERVICE

I certify that on 9/25/2014 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users and by serving a true and correct copy at the addresses listed below by hand delivery:

| | |
|---|---|
| Anthony F. Troy, VSB #05985<br>Charles A. Zdebski, VSB #37519<br>ECKERT SEAMANS CHERIN & MELLOTT, LLC<br>Eighth and Main Building, Suite 1450<br>707 East Main Street<br>Richmond, VA 23219<br>ttroy@eckertseamans.com<br>Attorney for Brandon Raub | John W. Whitehead, VSB #20361<br>Douglas McKusick, VSB #72201<br>THE RUTHERFORD INSTITUTE<br>1440 Sachem Place<br>Charlottesville, VA 22906<br>johnw@rutherford.org<br>douglasm@rutherford.org<br>Attorney for Brandon Raub |
| William H. Hurd, VSB #16967<br>Stephen C. Piepgrass, VSB #71361<br>TROUTMAN SANDERS LLP<br>Troutman Sanders Building<br>1001 Haxall Point<br>Richmond, VA 23219<br>william.hurd@troutmansanders.com<br>stephen.piepgrass@troutmansanders.com<br>Attorney for Brandon Raub | |

By:   */s/ Jeffrey L. Mincks*
Jeffrey L. Mincks, VSB #18317
County Attorney
P. O. Box 40
Chesterfield, Virginia 23832-0040
Telephone:  (804) 748-1491
Facsimile:   (804) 717-6297
mincksj@chesterfield.gov
Counsel for Michael Campbell

51